**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

CLAUDIA S. CASERES,

        Plaintiff,

v.                                      Case No. 6:13-cv-1001-Orl-37KRS

TEXAS DE BRAZIL (ORLANDO)
CORPORATION,

        Defendant.

**ORDER**

This cause is before the Court on the following:

1. Defendant Texas de Brazil (Orlando) Corporation's Motion to Stay and Compel Arbitration and Incorporated Memorandum of Law (Doc. 21), filed August 21, 2013; and

2. Plaintiff Claudia S. Caseres' Memorandum of Law in Opposition to Defendant's Motion to Stay and Compel Arbitration (Doc. 23), filed September 4, 2013.

**BACKGROUND**

**I.  Procedural Background**

On June 28, 2013, Plaintiff filed her initial Complaint seeking to recover unpaid wages and overtime under the Fair Labor Standards Act (the "FLSA") and Section 24, Article 10 of the Florida Constitution. (Doc. 1.) Defendant initially moved to dismiss or, in the alternative, to stay and to compel arbitration. (Doc. 7.) On July 31, 2013, Plaintiff filed her First Amended Complaint reasserting her claims under the FLSA and the Florida Constitution (Counts I through III) (Doc. 14, ¶¶ 33–41), and adding claims for

fraud in the inducement (Count IV) and intentional breach of fiduciary duty (Count V) arising from Plaintiff's execution of a "Dispute Resolution Agreement" (the "Agreement"). (*Id.* ¶¶ 42–54, Ex. A.) Plaintiff seeks rescission of the Agreement. (*Id.* ¶ 49(a).)

After Plaintiff filed her Amended Complaint, the Court denied as moot the Defendant's first motion to dismiss. (Doc. 16.) Defendant then filed a second Motion to Stay and Compel Arbitration on August 21, 2010. (Doc. 21.) Plaintiff filed a Memorandum of Law in Opposition to the Motion to Stay and Compel Arbitration. (Doc. 23.) Upon review of the parties' submissions, the record evidence, and the controlling law, the Court will reserve ruling on Defendant's Motion to Stay and Compel Arbitration pending an expedited jury trial to resolve the disputed questions of fact related to the arbitrability question.

**II.     Factual Background**

Plaintiff is a Honduran immigrant who denies any ability to read, write, or speak any language except Spanish.[1] (Doc. 23-1, ¶¶ 2–6.) From September 2010 through June 2013, Defendant employed Plaintiff as a "busser" in its restaurant located in Orange County, Florida. (*Id.* ¶ 7; Doc. 14, ¶¶ 4, 12.) According to Plaintiff, she worked approximately fifty-five hours per week, but Defendant failed to pay her minimum wage and overtime. (Doc. 14, ¶¶ 13–16.)

On January 17, 2012, Plaintiff attended a meeting held by Defendant at her place of employment (the "Meeting"). At the Meeting, Defendant's Human Resources employee, Danielle Goodgion, distributed the Agreement and a pamphlet titled "How to

---

[1] Defendant disputes that Plaintiff does not understand English. (Doc. 21, p. 35 ("Based on my interactions with [Plaintiff], it appears that she understood English fairly well. She would follow instructions provided to her in English and would only occasionally ask that I translate certain words.").)

File a Grievance, Mediate, and Arbitrate" (the "Pamphlet") to approximately fifty employees. (Doc. 23-1, ¶¶ 8–14; Doc. 21, Ex. A, ¶¶ 6–7; Doc. 21, Ex. B, ¶¶ 3, 7.) Some employees signed the Agreement at the Meeting, others declined to sign, and others left the Meeting with the materials to review before signing. (Doc. 21, p. 20.)  Plaintiff signed the Agreement at the Meeting.  (*Id.* at 21, 31–32.)

The two-page Agreement and four-page Pamphlet were written in English only. (Doc. 21, Exs. A-1 & A-2.) The first paragraph of the two-page Agreement sets forth a broad agreement to arbitrate:

> You and Texas de Brazil, its related companies as well as current and former employees of the Company (the "Company") **agree to grieve (formally complain), mediate, and then if necessary arbitrate, any lawful dispute/claim that may arise between us**. In other words, instead of going to court, both sides agree to grieve, mediate and, if necessary, arbitrate their legal disputes.

(Doc. 14-1 (emphasis added).) The remaining paragraphs of the Agreement provide that: (1) the Pamphlet was part of the Agreement; (2) the parties could proceed with or without lawyers in any arbitration, and if Plaintiff did not use a lawyer, then Defendant would not use a lawyer; (3) Plaintiff waived her "right to bring or be a member of any class or collective action"; (4) Plaintiff was free to file a claim or participate "in an investigation conducted by any federal, state, or local government agency"; (5) unemployment claims and workers' compensation claims, and claims based on Defendant's pension and welfare benefit plan were "not covered" by the Agreement; (6) the Agreement was supported by consideration, including Plaintiff's receipt of a $10 gift card; (7) the Agreement was severable and controlled by Florida law; and (8) the parties agreed to a non-jury trial "if any provision of [the] Agreement is unenforceable and cannot be amended by a court or arbitrator to be enforceable or if a claim is found

not to be subject to this Agreement." (*Id.*) The Agreement concluded with the following paragraph, in bold, immediately above Plaintiff's signature:

> **This Agreement and Pamphlet are legal documents which bind you and the Company to grieve, mediate, and, if necessary, arbitrate all disputes that could be brought in court**. By signing below you are acknowledging you have been provided with a $10 retailer gift card, a copy of this Agreement, and the Pamphlet and have had sufficient time to read and understand them. You have the right and are advised to seek legal counsel regarding the meaning and effect of this Agreement. Nothing in this Agreement/Pamphlet alters the at-will nature of our employment relationship. You are signing this Agreement of your own free will, free of any duress or coercion.

(*Id.* at 2 (emphasis added).)

According to Plaintiff, in the first twenty minutes of the Meeting, Goodgion distributed the Agreement and Pamphlet and explained both in English. (Doc. 14, ¶¶ 18–21; Doc. 23-1, ¶¶ 10–11.) In the final five minutes of the meeting, Plaintiff's supervisor "commenced to translate [Goodgion's] presentation and the documents she had handed out into Spanish."[2] (Doc. 14, ¶¶ 22–30; Doc. 21, Ex. A, ¶¶ 8, 12–14; Doc. 21, Ex. B, ¶¶ 7–8; Doc. 23-1, ¶¶ 12–15.) Plaintiff described the Spanish presentation as follows:

- "Mr. Oscar Garcia translated in Spanish that Ms. Danielle Goodgion's presentation and the documents she had handed out . . . described how to make a complaint to Human Resources." (Doc. 14, ¶ 24; Doc. 23-1, ¶ 15.)

- "Mr. Oscar Garcia went on to explain in Spanish that Ms. Danielle Goodgion's presentation and the documents she had handed out during her presentation simply outline how to make a complaint with Human Resources if an employee wanted to make a complaint." (Doc. 14, ¶ 25; Doc. 23-1, ¶ 16.)

- "Mr. Oscar Garcia advised in Spanish that the presentation and

---

[2] Plaintiff identifies the translator as Oscar Garcia, while Defendant contends that the person who made the Spanish presentation at the Meeting was Mario Vega. (Doc. 21.)

documents discussed how to make a complaint to the Human Resources Department and in signing the document Plaintiff was simply acknowledging that she understood that this is what the presentation and documents stated." (Doc. 14, ¶ 26; Doc. 23-1, ¶ 22.)

- "Mr. Oscar Garcia advised in Spanish that the Plaintiff (and other employees in attendance) could not leave the meeting before signing the [A]greement." (Doc. 14, ¶ 27; Doc. 23-1, ¶ 23.)

- "Mr. Oscar Garcia did not mention in Spanish the words arbitrate, mediate, or grievance." (Doc. 14, ¶ 28; Doc. 23-1, ¶ 17.)

- "Mr. Oscar Garcia did not advise or translate to Plaintiff that by signing the agreement Plaintiff would be waiving her constitutional right of access to court." (Doc. 14, ¶ 29; Doc. 23-1, ¶ 18.)

- "Mr. Oscar Garcia did not advise or translate that by signing the [A]greement Plaintiff would be waiving her constitutional right to trial by jury." (Doc. 14, ¶ 30; Doc. 23-1, ¶ 19.)

- "Mr. Oscar Garcia did not advise or translate that by signing the [A]greement the Plaintiff would be waiving her right to participate in a class or collective action." (Doc. 14, ¶ 31; Doc. 23-1, ¶ 20.)

Plaintiff alleges in her Amended Complaint that she "detrimentally relied on Defendant's intentional misrepresentations" concerning the content of the Agreement and the effect of her signature. (Doc. 14, ¶¶ 48–49.) Plaintiff also claims that she requested a Spanish-language copy of the Agreement, but none was provided to her.[3] (*Id.* ¶ 32.) Finally, Plaintiff contends that she did not learn until she filed this action that the Agreement is entitled "Dispute Resolution Agreement." (Doc. 23-1, ¶ 24.)

Defendant does not contend that it provided Plaintiff with a copy of the Agreement in Spanish. However, Defendant disputes Plaintiff's version of what happened at the Meeting. According to Defendants:

---

[3] The following was printed above the signature line on the Agreement: "Yo no entiendo este acuerdo. Es posible que yo llame a la cede de la compania para abtener una copia de esta acuerdo en espanol." (Doc. 21, Ex. A-1.) Roughly translated, this means, "I do not understand this Agreement. I may call the company to obtain a copy of the Agreement in Spanish."

5

- After the "English presentation," Goodgion announced that she would "hold a separate meeting to review the materials in Spanish. In this meeting, [Goodgion] again went through the entire Agreement and Open Door Policy, and had Chef/Kitchen Manager, Mario Vega, translate it into Spanish." (Doc. 21, pp. 20–21, 34.)

- Goodgion and Vega "translated each section of the Agreement, including the sections on (1) the grievance, mediation and arbitration processes, (2) the no lawyer option, (3) waiver of class and collective claims, administrative charges, (4) claims not covered, (5) consideration, (6) severability and choice of law, and (7) acknowledgment." (*Id.* at 21, 35.)

- After translating each section of the Agreement, Goodgion and Vega asked the attendees of the Meeting if they understood and had any questions. (*Id.*)

- The attendees at the meeting were not told "that they had to sign the Agreement that day or that they could not leave the [M]eeting before signing the Agreement." (*Id.*)

- Plaintiff "attended both the English and Spanish presentations and did not ask any questions or ask to take the Agreement home with her before signing." (*Id.*)

- The Meeting was held in an open area of the "restaurant and employees were free to come and go. The employees were not restrained in any way." (*Id.*)

Clearly, factual conflicts exist in the concerning the circumstances under which Plaintiff signed the Agreement.

## STANDARDS

The Federal Arbitration Act ("FAA") embodies a liberal federal policy favoring arbitration agreements by declaring written arbitration provisions involving commerce to be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[4] 9 U.S.C. § 2; *see Mitsubishi Motors Corp. v.*

---

[4] Under this policy, courts are required to enforce written agreements to arbitrate. *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630 n.5 (2009); *e.g., Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002); *Caley v. Gulfstream Aerospace Corp.*, 428

*Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (stating that the FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution"); *e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203–04 (2012) (holding that state law prohibiting arbitration of certain claims was preempted by the FAA); *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012) (reversing decision that statutory claim was non-arbitrable).

Notwithstanding the strong federal policy in favor of arbitration, the U.S. Supreme Court has made it clear that arbitration under the FAA "is a matter of consent, not coercion . . . ." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Further, the FAA preserves "generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011).

State law governs the formation and interpretation of written arbitration agreements, and federal law provides the substantive law controlling the validity and enforcement of such agreements. 9 U.S.C. § 2; *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001). Specifically, the FAA provides the following procedures for resolution of disputes concerning enforcement of arbitration agreements:

> Under Section 3, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." Under Section 4, a party "aggrieved" by the

---

F.3d 1359, 1367 (11th Cir. 2005).

failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." The court "shall" order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."

*Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010). If a dispute exists concerning the "making of the agreement for arbitration," then the Court may schedule an expedited trial to resolve the dispute.[5] (Doc. 21, p. 9 n.7.)

## DISCUSSION

The Agreement is subject to Florida law; thus, the Court must compel arbitration if Defendant shows that: (1) the Agreement is "an enforceable contract" under Florida law; and (2) Plaintiff's claims fall within the scope of the Agreement. *See*, *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). Plaintiff contends that she could not assent to the Agreement because its terms are ambiguous and "Defendant fraudulently misrepresented the character and essential terms of the purported contract."[6] (Doc. 23, pp. 1–2.) Defendant counters that the evidence that Plaintiff signed the Agreement and accepted the consideration is sufficient to compel arbitration. (Doc. 21, pp. 6–7.)

---

[5] Under Section 4, parties may demand a jury trial on the arbitrability question:

If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue. Where such an issue is raised, **the party alleged to be in default may . . . demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose** . . . .

9 U.S.C. § 4 (emphasis added).

[6] A fair reading of the brief and straightforward Agreement reveals no fatal ambiguity.

8

Defendants further contend that the Court should leave to the arbitrator the question of fraudulent inducement.[7] (Doc. 21, pp. 14–15.)

**I.      Arbitrability**

The Court rejects Defendant's argument that the arbitrator must resolve Plaintiff's fraudulent inducement and rescission claims. Pursuant to Sections 3 and 4 of the FAA, the "question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the 'question of arbitrability,' is 'an issue for judicial determination.'" *Howsam*, 537 U.S. at 83 (alterations in original) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *e.g.*, *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). Further, if a claim of fraudulent inducement relates to the arbitration agreement itself, then a court should resolve the issue. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it."); *e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator.").

Here, the Agreement is solely concerned with alternative dispute resolution—it is not part of a larger transaction. Thus, Plaintiff's fraud and rescission claims go to the agreement to arbitrate itself. Because Plaintiff's claims concern a stand-alone arbitration agreement, the Court must resolve Plaintiff's claims. *See Prima Paint Corp.*, 388 U.S. at

---

[7] While Defendants concede that federal courts have "authority to adjudicate claims of fraud in the inducement of the arbitration clause itself," Defendant contends that Plaintiff's fraud claim goes to the "<u>entire</u>" Agreement; thus, "it is the arbitrator who must hear Plaintiff's" fraud claim. (Doc. 21, p. 14 (emphasis in original).)

403–04; *Medident Constr., Inc. v. Chappell*, 632 So. 2d 194, 194 (Fla. 3d DCA 1994) (holding that courts should resolve attacks "exclusively directed toward the arbitration clause or a separate agreement to arbitrate"); *e.g., Sanchez v. Criden*, 899 So. 2d 326 (Fla. 3d DCA 2005) (holding that claims for complete rescission of an arbitration agreement must be considered by the court).

## II.     Factual Disputes

Defendant contends that if the Court decides the fraud and rescission claims, then the Court should reject such claims because Plaintiff has submitted insufficient evidentiary support to the Court. When a party denies the existence of a valid arbitration agreement, "that party must substantiate the denial of the contract with enough evidence to make the denial colorable." *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 855 (11th Cir. 1992). "A party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists." *Id.* Rather, trial by jury of the arbitrability question is warranted only by "an unequivocal denial that the agreement had been made," which is substantiated by evidence. *Id.* at 854 (citing *T & R Enters., Inc. v. Cont'l Grain Co.*, 613 F.2d 1272, 1278 (5th Cir. 1980)).

Here, Plaintiff's sworn statements are sufficient to raise a colorable issue that the Agreement was procured by fraud. *Cancanon v. Smith Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000–01 (11th Cir. 1986) (affirming denial of arbitration where the non-English speaking plaintiffs claimed that the defendant falsely translated the substance of the parties' agreement); *Begualg Inv. Mgmt., Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153-Civ., 2012 WL 5941971, at *3—5 (S.D. Fla. Nov. 28, 2012) (finding that a question of fact concerning fraud was raised by defendant's false translation of material terms of a contract to the non-English speaking plaintiff); *Hialeah Automotive, LLC v.*

*Basulto*, 22 So. 3d 586, 593 (Fla. 3d DCA 2009) (permitting plaintiffs to argue that no arbitration agreement was formed because defendant failed to mention arbitration when translating agreement). Therefore, the Court will order an expedited jury trial solely concerning the making of the Agreement.  9 U.S.C. § 4.

## CONCLUSION

Accordingly, it is hereby **ORDERED and ADJUDGED** that on or before Tuesday, November 12, 2013, the parties shall meet and confer and shall submit a proposed case management plan for expedited discovery and a jury trial concerning the arbitration-related matters identified in this Order.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on November 4, 2013.

_____

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record